FILED
CLERK, U.S. DISTRICT COURT

5/29/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ASI_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2024 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>NORMITA SIERRA,<br>  aka "Normie,"<br>ROWENA ELEGADO,<br>  aka "Weng,"<br><br>          Defendants. | CR 2:25-cr-00419-AB<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1347(a)(1): Health Care Fraud; 18 U.S.C. § 371: Conspiracy; 42 U.S.C. § 1320a-7b(b)(2)(A): Illegal Remuneration for Health Care Referrals; 18 U.S.C. § 982: Criminal Forfeiture] |

The Grand Jury charges:

COUNTS ONE THROUGH NINE

[18 U.S.C. §§ 1347(a)(1); 2]

[Defendant SIERRA]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

The Defendant and Associated Entities and Individuals

1.   Defendant NORMITA SIERRA, also known as "Normie," was a resident of West Covina and Walnut, California.

2.   Defendant SIERRA was the Chief Executive Officer ("CEO") and President of Golden Meadows Hospice, LLC ("Golden Meadows"), a

hospice provider located in West Covina, California, and enrolled as a Medicare provider. Defendant SIERRA signed a Medicare enrollment application as an Authorized Official for Golden Meadows, certifying that she would abide by Medicare laws, regulations, and program instructions of the Medicare program. Defendant SIERRA was a signer on the Golden Meadows business bank account at Citizens Business Bank ("Golden Meadows Account") into which Medicare reimbursements were electronically deposited.

3.    Defendant SIERRA was also the CEO of D'Alexandria Hospice, Inc. ("D'Alexandria"), another hospice provider located in West Covina, California, and enrolled as a Medicare provider. Defendant SIERRA signed a Medicare enrollment application as an Authorized Official for D'Alexandria, certifying that she would abide by Medicare laws, regulations, and program instructions of the Medicare program. Defendant SIERRA was a signer on the D'Alexandria business bank account at Bank of America ("D'Alexandria Account 1") into which Medicare reimbursements were electronically deposited, as well as another D'Alexandria business bank account at Bank of America ("D'Alexandria Account 2").

4.    Physician 1, a physician licensed in the State of California, was employed by Golden Meadows and D'Alexandria, including as the Medical Director for those entities.

5.    Relyndo Salcedo, a nurse practitioner and registered nurse licensed in the State of California, was employed by both Golden Meadows and D'Alexandria, including as the Designee or Assistant Director of Nursing and Director of Nursing.

6.    Carl Bernardo was one of multiple marketers who received payments for the referral of Medicare patients to Golden Meadows and D'Alexandria.

7.    Defendant SIERRA also owned, operated, or otherwise controlled multiple medical clinics ("SIERRA Medical Clinics") that purported to provide mobile medical services.

The Medicare Program

8.    Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

9.    Individuals receiving Medicare benefits were known as "beneficiaries."  Each Medicare beneficiary was given a Health Insurance Claim Number ("HICN") unique to that beneficiary.

10.   Hospices, physicians, and other health care providers who provided services to beneficiaries that were reimbursed by Medicare were referred to as "providers."

11.   To become eligible to participate in Medicare, Medicare required prospective providers to be licensed by a state or local agency.  After obtaining the applicable license, Medicare required prospective hospice providers to submit an application in which the prospective provider agreed to: (a) comply with all Medicare-related laws and regulations, including the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which prohibited the offering, paying, soliciting, or receiving of any remuneration for the referral of Medicare beneficiaries; and (b) not submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or

reckless disregard of their truth or falsity.  If Medicare approved the application, Medicare assigned the provider an identifying number, which enabled the provider to submit claims to Medicare for reimbursement for services provided to Medicare beneficiaries.

Medicare Coverage of Hospice Services

12.  Medicare was divided into different program "parts": Part A, Part B, Part C, and Part D.  Hospice services were covered under Medicare Part A (hospital-related services).

13.  Hospice services reimbursed by Medicare were palliative in nature and included, but were not limited to, medications to manage pain symptoms, necessary medical equipment, and bereavement services to surviving family members.

14.  Medicare reimbursed providers for hospice services provided to a beneficiary only if the beneficiary was terminally ill, as certified by both the beneficiary's attending physician, if the beneficiary had one, and the medical director or a physician member of the hospice's interdisciplinary group ("IDG").  The attending physician was the physician that the beneficiary identified when he/she elected to receive hospice care as the medical practitioner with the most significant role in the determination and delivery of the beneficiary's medical care.  Medicare considered a beneficiary to be "terminally ill" if the beneficiary's life expectancy was six months or less if the beneficiary's illness ran its normal course.

15.  A beneficiary was required to elect to receive hospice services and complete an election form that included an acknowledgement that the beneficiary had been given a full understanding of hospice care, including the palliative rather than curative nature of treatment, and an acknowledgement that the

4

beneficiary understood that certain Medicare services were waived by the election of hospice care.  When a Medicare beneficiary elected hospice coverage, the beneficiary waived all rights to Medicare Part B (outpatient physician services and procedures) coverage of services to treat or reverse the beneficiary's terminal illness while the beneficiary was on hospice.

16.  A beneficiary could elect to receive hospice benefits for two periods of 90 days and, thereafter, additional services for periods of 60 days per period.

17.  After the second 90-day period, for the beneficiary to continue to receive reimbursable hospice benefits, Medicare required that a physician re-certify that the beneficiary was terminally ill and include clinical findings or other documentation supporting the diagnosis of terminal illness.  For re-certifications, Medicare required a hospice physician or nurse practitioner to meet with the beneficiary in person and conduct a face-to-face evaluation before signing a certification of terminal illness.

B.    THE FRAUDULENT SCHEME

18.  Beginning in or around September 2018, and continuing through at least in or around October 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendant SIERRA, together with Relyndo Salcedo and others known and unknown to the Grand Jury, each aiding and abetting one another, knowingly, willfully, and with the intent to defraud, executed, and willfully caused to be executed, a scheme and artifice to defraud a health care benefit program, namely Medicare, in connection with the delivery of or payment for health care benefits, items or services.

C.  MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

19.  The fraudulent scheme operated, in substance, as follows:

a.  Defendant SIERRA solicited and caused to be solicited referrals of Medicare patients to Golden Meadows and D'Alexandria from individuals like Carl Bernardo known as "marketers" in exchange for illegal kickbacks paid by or at the direction of defendant SIERRA.  As defendant SIERRA and Relyndo Salcedo well knew, most of those patients referred by marketers had not been referred for hospice by their primary care physicians and were not eligible to receive hospice services covered by Medicare because they were not terminally ill.

b.  Defendant SIERRA caused the patients referred by marketers to be sent to the SIERRA Medical Clinics, where they were seen, typically by nurse practitioners, including Salcedo, and then purportedly referred to Golden Meadows and D'Alexandria for hospice evaluations by physicians supposedly supervising those nurse practitioners.  However, in at least some instances, those physicians were not aware of and had not authorized the hospice referrals.

c.  Salcedo purported to visit patients (most of whom had been referred by marketers) on behalf of Golden Meadows and D'Alexandria to evaluate whether the patients were qualified to receive (or, if they were already enrolled, to continue to receive) hospice services covered by Medicare from Golden Meadows or D'Alexandria.

d.  Salcedo often advised or caused defendant SIERRA to be advised that the patients did not qualify for hospice services.  However, defendant SIERRA, although not herself a licensed medical professional, controlled whether or not patients were enrolled with

6

the hospice companies and often caused those unqualified patients to
be enrolled with Golden Meadows or D'Alexandria notwithstanding
Salcedo's advisements, including by pressuring Salcedo to complete
evaluations that would purport to support the admission of these
unqualified patients.

e.   Under pressure from defendant SIERRA and/or the
marketers to admit unqualified patients, Salcedo exaggerated and
falsified patients' medical conditions in the medical records to make
it seem as though the patients were terminally ill, when in fact he
knew they were not.  Salcedo did so knowing and intending that such
fraudulent documentation would facilitate the patients' enrollment
with Golden Meadows or D'Alexandria.

f.   In order to conceal that unqualified patients were
being admitted at the direction of defendant SIERRA, Salcedo at times
backdated his signature on those evaluations to make it look as
though the evaluations were completed (and supported the patients'
qualifications for hospice services) prior to the patients'
enrollment or reenrollment for hospice services, even when those
evaluations did not occur until after the patients had already been
enrolled or reenroll in hospice services and/or did not support
hospice admission.

g.   Defendant SIERRA and Salcedo provided or caused those
intake or recertification evaluations to be provided to physicians
employed by Golden Meadows and D'Alexandria, including, primarily,
Physician 1.  Defendant SIERRA and Salcedo knew that Physician 1 was
not the patients' primary care physician, would typically not see the
patients himself, and would instead rely almost entirely on Salcedo's
patient evaluations in determining whether to certify or recertify

Golden Meadows' and D'Alexandria's patients as having terminal illnesses that qualified them to receive hospice services covered by Medicare.

h.    Defendant SIERRA used and caused to be used Salcedo's fraudulent evaluations (and the certifications of terminal illness premised on those evaluations), to support the purported necessity of hospice services and caused Golden Meadows and D'Alexandria to submit fraudulent claims to Medicare for those unnecessary hospice services.

i.    In order to, among other things, conceal that Golden Meadows' and D'Alexandria's patients were not passing away (as one would expect of patients with terminal illnesses that qualified them for hospice services) and that Medicare was being fraudulently billed for unnecessary hospice services, defendant SIERRA caused patients to be discharged from hospice, often at around 180 days, and often pressured and directed Salcedo to create medical records supporting the enrollment of those patients in another hospice or in a home health agency defendant SIERRA controlled.

20.    During the above-described scheme, Golden Meadows submitted at least approximately $3,870,642 in fraudulent claims, on which claims Medicare paid approximately $2,912,187, while D'Alexandria submitted approximately $945,647 in fraudulent claims, on which claims Medicare paid approximately $894,199.

D.    EXECUTIONS OF THE FRAUDULENT SCHEME

21.    On or about the dates below, within the Central District of California, and elsewhere, defendant SIERRA, together with Salcedo and others known and unknown to the Grand Jury, each aiding and abetting one another, knowingly and willfully executed and willfully caused the execution of the fraudulent scheme described above by

submitting and causing to be submitted the following false and fraudulent claims to Medicare for hospice services:

| COUNT | DATE | CLAIM NO. / BENEFICIARY INITIALS | AMOUNT |
|---|---|---|---|
| ONE | 10/5/2020 | 22027901193807CAR / M.P.R. | $7,000.00 |
| TWO | 11/5/2020 | 22031000893507CAR / M.B. | $6,630.36 |
| THREE | 11/30/2020 | 22033501320707CAR / M.R. | $7,474.80 |
| FOUR | 8/25/2021 | 22123700435604CAR / B.O. | $6,900.00 |
| FIVE | 8/25/2021 | 22123700440004CAR / S.O-G. | $6,900.00 |
| SIX | 11/3/2021 | 22120700590104CAR / A.W. | $6,831.35 |
| SEVEN | 11/3/2021 | 22130700593504CAR / R.W. | $6,831.35 |
| EIGHT | 2/3/2022 | 22203400721204CAR / V.U. | $7,252.54 |
| NINE | 2/3/2022 | 22203400724904CAR / E.U. | $7,252.54 |

1

COUNT TEN

2

[18 U.S.C. § 371]

3

[Defendants SIERRA and ELEGADO]

4      22.  The Grand Jury realleges paragraphs 1 through 17 and 19 of

5  this Indictment here.

6  A.  <u>INTRODUCTORY ALLEGATIONS</u>

7      23.  Defendant ROWENA ELEGADO, also known as "Weng," was a

8  resident of North Hollywood, California.  Defendant ELEGADO

9  maintained a JPMorgan Chase Bank account (the "Elegado Account").

10      24.  Defendant ELEGADO was the manager of RSE Consulting, LLC, a

11  corporation purportedly engaged in "consulting."

12      25.  LGA Home Health, Inc. ("LGA") was a home health agency

13  located in West Covina, California, and an enrolled Medicare provider

14  that submitted claims to Medicare for home health services.

15  Defendant SIERRA was the Authorized Official for LGA, while defendant

16  ELEGADO was its Delegated Official.  Both defendants SIERRA and

17  ELEGADO certified to Medicare that they would abide by Medicare laws,

18  regulations, and program instructions of the Medicare program.

19  Defendant SIERRA was a signer on LGA's JPMorgan Chase Bank business

20  checking accounts ("LGA Chase Account 1" and "LGA Chase Account 2").

21      26.  Carl Bernardo and Marketer 1 were among the multiple

22  marketers who referred patients to LGA in exchange for payments.

23      27.  Employee 1 was an employee of Golden Meadows and

24  D'Alexandria.

25      28.  Individual 1 was an individual who provided accounting

26  services for defendant SIERRA and her businesses.

27

28

1  B.   OBJECT OF THE CONSPIRACY

2       29.  Beginning no later than in or around September 2018 and

3  continuing through in or around June 2022, in Los Angeles County,

4  within the Central District of California, and elsewhere, defendants

5  SIERRA and ELEGADO conspired with one another and others known and

6  unknown to the Grand Jury to knowingly and willfully offer and pay,

7  and cause to be offered and paid, remuneration, including checks and

8  cash, which constituted kickbacks to marketers for referring patients

9  to Golden Meadows and D'Alexandria for hospice services and to LGA

10 for home health services, for which services payment could be made in

11 whole or in part under a Federal health care program, namely,

12 Medicare, in violation of Title 42, United States Code, Section

13 1320a-7b(B)(2)(A).

14 C.   MANNER AND MEANS OF THE CONSPIRACY

15      30.  The object of the conspiracy was to be carried out, and was

16 carried out, in substance, as follows:

17           a.   Defendant SIERRA would solicit and cause to be

18 solicited referrals of Medicare patients to Golden Meadows,

19 D'Alexandria, and LGA from marketers like Carl Bernardo and Marketer

20 1, in exchange for illegal kickbacks paid by or at the direction of

21 defendant SIERRA.

22           b.   Defendant SIERRA would negotiate the amounts of these

23 kickbacks with the marketers, typically paying the marketers between

24 $1,000 and $1,300 per patient per month the patient remained on

25 service for referrals of patients to Golden Meadows and D'Alexandria

26 for hospice services covered by Medicare and $800 per patient for the

27 initial enrollment period and $400 for subsequent enrollment periods

28

                                   11

for referrals of patients to LGA for home health services covered by Medicare.

        c.   Defendants SIERRA and ELEGADO would pay and cause these marketers to be paid for their referrals through both cash and checks.

        i.   Sometimes marketers would be paid in cash, often contained in envelopes distributed to the marketers at the offices of Golden Meadows and D'Alexandria or at defendant SIERRA's residence. To obtain this cash, defendants SIERRA and ELEGADO would cash checks, including checks made out to defendant ELEGADO's RSE Consulting and checks drawn on the Elegado Account. At times defendants SIERRA and ELEGADO would also have others, including Golden Meadows and D'Alexandria employees, cash checks for them and return the cash to defendant SIERRA. While the cash nature of the payments concealed the amounts and recipients of the payments, those cashed checks offered further concealment, sometimes made out to "cash," sometimes made out to a payee but containing memo lines misrepresenting that the payments were for something other than payments for patient referrals, including loans, reimbursements for business expenses, or "girl scout cookies."

        ii.   Sometimes marketers would be paid by check, including checks containing memo lines purportedly connecting the payments to something other than payments for patient referrals, including loans, reimbursements for business expenses, or girl scout cookies.

        iii. Defendant ELEGADO would also pay some marketers by Zelle payment.

1        d.   At defendant SIERRA's direction, defendant ELEGADO and

2   Employee 1 would track the marketers' patient referrals, including on

3   spreadsheets of monthly "marketing expenses."  Defendant SIERRA would

4   typically identify which patients were associated with which

5   marketers.

6        e.   To conceal the nature of the payments to marketers, in

7   communicating with each other, defendants SIERRA and ELEGADO,

8   Employee 1, and the marketers would often refer to the kickback

9   payments as "cookies" or "girl scout cookies."  Defendant SIERRA also

10  asked Employee 1 to stop saving the spreadsheets in order to conceal

11  the marketers' referrals of patients to Golden Meadows, D'Alexandria,

12  and LGA.

13  D.   <u>OVERT ACTS</u>

14       31.  On or about the following dates, in furtherance of the

15  conspiracy and to accomplish its object, defendants SIERRA and

16  ELEGADO, together with their co-conspirators, committed and willfully

17  caused others to commit the following overt acts, among others,

18  within the Central District of California, and elsewhere:

19       <u>Overt Act No. 1:</u>   On December 9, 2020, defendant ELEGADO noted

20  "12/9 CASH $1,600" under a piece of paper on which appears "12/9

21  (Carl)" and the names of V.U. and E.U., two patients referred by Carl

22  Bernardo to D'Alexandria in exchange for kickbacks.

23       <u>Overt Act No. 2:</u>   On December 20, 2020, defendant ELEGADO,

24  using the LGA administration email, emailed defendant SIERRA at

25  normita.sierra@yahoo.com with the subject line "Golden Meadows Check

26  5125," and attaching the file Scan_20201220.pdf.  That attachment

27  contained a copy of a check (no. 5125) drawn on the Golden Meadows

28  Account for $8,400, payable to LGA HOME HEALTH, INC., with the memo

line "PAYMENT OF LOAN," and signed by defendant SIERRA, as well as handwritten notes indicating "Carl" followed by four patient names, including M.P.R., under "GOLDEN MEADOWS" with $4,800 to the right, and two patient names under "D'ALEXANDRIA" with $2,600 to the right, and "SONNY," followed by one patient name under "D'ALEXANDRIA" with $1,000 to the right.

Overt Act No. 3:    Defendant ELEGADO wrote a check dated January 13, 2021, drawn on the Elegado Account and payable to "CASH" for $1,600, which check was associated with payment for Marketer 1's referral of two patients.

Overt Act No. 4:    Defendant ELEGADO wrote "Carl" and the name of two patients referred by Carl Bernardo to D'Alexandria Hospice in exchange for kickbacks on a document recording check number 2001 associated with D'Alexandria, dated February 17, 2021, in the amount of $2,600, and payable to "CASH," which check was drawn on D'Alexandria Account 2 and signed by defendant SIERRA.

Overt Act No. 5:    On May 17, 2021, defendant ELEGADO, using the LGA administration email, emailed Employee 1 at Golden Meadows a chart showing patients and their associated marketers, with an "x" next to six of the lines corresponding to patients, and, below the table, the numbers "6," "$1,200," and "$7,200."

Overt Act No. 6:    On May 17, 2021, in response to the email described in Overt Act 5, Employee 1 emailed defendant ELEGADO, stating that defendant ELEGADO could inquire with defendant SIERRA as to which marketer referred a particular patient, stating:  "Just not Sure how [sic] the [C.T.] patient is.  Not sure if it came from Susan or who?...Maybe ask Ms. Normie."

14

<u>Overt Act No. 7:</u>    On May 20, 2021, defendant ELEGADO, using the LGA administration email, received an email from Employee 1 at Golden Meadows with the subject line "Girl Scouts Cookies for Golden Meadows" and attaching the file "Marketing Expenses—NORMIE-5-20-2021," in which Employee 1 provided defendant ELEGADO with the "Updated list for cookies" and asked defendant ELEGADO "what time they will be ready to pick up."

<u>Overt Act No. 8:</u>    On June 30, 2021, defendant ELEGADO, using the LGA administration email, emailed Individual 1 a chart under the name LGA, the top line of which chart showed a bank balance as of June 30, 2021 with lines underneath containing dates, check numbers, payment details, and amounts, including an entry on June 30, 2021, for check 2419 for "cookies" in the amount of $5,000.

<u>Overt Act No. 9:</u>    On June 30, 2021, check number 2419 was drawn on LGA Chase Account 1 for $5,000, payable to defendant ELEGADO and signed by defendant SIERRA, with a memo line containing the address for defendant ELEGADO and RSE Consulting and the word "loan."

<u>Overt Act No. 10:</u>    On July 6, 2021, Individual 1 responded to the email described in Overt Act 8, copying defendant SIERRA at normita@thediamondgrp.net.

1            COUNTS ELEVEN THROUGH FOURTEEN

2        [42 U.S.C. § 1320a-7b(b)(2)(A); 18 U.S.C. § 2(b)]

3              [Defendants SIERRA and ELEGADO]

4        32.  The Grand Jury realleges paragraphs 1 through 17, 19, 23

5   through 28, and 30 through 31 of this Indictment here.

6        33.  On or about the dates set forth below, in Los Angeles

7   County, within the Central District of California, and elsewhere,

8   defendants SIERRA and ELEGADO, together with others known and unknown

9   to the Grand Jury, knowingly and willfully offered and paid, and

10  caused to be offered and paid, remuneration, namely, the following

11  amounts and payment types, which constituted kickbacks to marketers

12  for referring patients to Golden Meadows and D'Alexandria for hospice

13  services and to LGA for home health services, for which services

14  payment could be made in whole and in part under a Federal health

15  care program, namely, Medicare:

| COUNT | CHECK DATE | PAYMENT INFORMATION |
|---|---|---|
| ELEVEN | 12/9/2020 | Cash payment of $1,600 to Carl Bernardo |
| TWELVE | 12/21/2020 | Check no. 5125 in the amount of $8,400 drawn on the Golden Meadows Account and payable to LGA Home Health, Inc. for "PAYMENT OF LOAN" |
| THIRTEEN | 1/13/2021 | Check no. 8718 in the amount of $1,600 drawn on the Elegado Account and payable to "CASH" |
| FOURTEEN | 2/17/2021 | Check no. 2001 in the amount of $2,600 drawn on D'Alexandria Account 2 and payable to "CASH" |

FORFEITURE ALLEGATION

[18 U.S.C. § 982(a)(7)]

1.    Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(7), in the event of any defendant's conviction of the offenses set forth in any of Counts One through Fourteen of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

        (a)   All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction; and

        (b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been

//

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/
Foreperson

BILAL A. ESSAYLI
United States Attorney

CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division

KRISTEN A. WILLIAMS
Assistant United States Attorney
Chief, Major Frauds Section